UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                                                            MEMORANDUM
                                                            AND ORDER
        - against -                                         05-CR-188 (JG)


TYRONE HUNTER and ADRIAN
PAYNE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

A P P E A R A N C E S :

        BENTON J. CAMPBELL
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:     Christina B. Dugger
                Attorney for Government

        LAW OFFICE OF DONALD D. DuBOULAY, ESQ.
                401 Broadway, Suite 2507
                New York, NY 10013
        By:     Donald D. duBoulay
                Attorney for Defendant Tyrone Hunter

        LAW OFFICE OF OLIVER A. SMITH, ESQ.
                75 Maiden Lane, Suite 231
                New York, NY 10038
        By:     Oliver A. Smith
                Attorney for Defendant Tyrone Hunter

        ROTHMAN, SCHNEIDER, SOLOWAY & STERN, P.C.
                100 Lafayette Street, Suite 501
                New York, NY 10013
        By:     David Stern
                Attorneys for Defendant Adrian Payne

LAW OFFICE OF NORMAN TRABULUS
    1372 Broadway, Suite 1402
    New York, NY 10018
By:    Norman Trabulus
    Attorney for Defendant Adrian Payne

JOHN GLEESON, United States District Judge:

        Codefendants Tyrone Hunter and Adrian Payne challenge the jury verdicts convicting them of several murder, racketeering, firearms and drug trafficking charges. They move for judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29(c) or, in the alternative, for a new trial pursuant to Rule 33. For the reasons stated below, I find that Hunter is entitled to a judgment of acquittal on Counts Three (conspiracy to murder Clemons in aid of racketeering) and Twelve (use of a firearm in relation to Counts Ten and Eleven), and is entitled to a new trial on Counts One (racketeering), Two (racketeering conspiracy), and Ten (conspiracy to distribute crack and powder cocaine), but I sustain his conviction on Count Four (murder of Eric Clemons in aid of racketeering). I find Payne is entitled to a judgment of acquittal on Counts Three (conspiracy to murder Clemons in aid of racketeering), Five (conspiracy to murder Pedro Newton in aid of racketeering), and Thirteen (conspiracy to distribute heroin), but I sustain his conviction on Counts One (racketeering), Two (racketeering conspiracy), Four (murder of Clemons in aid of racketeering), Six (murder of Newton in aid of racketeering), Ten (conspiracy to distribute crack and powder cocaine), Eleven (distribution of crack and powder cocaine), and Twelve (use of a firearm in relation to counts Ten and Eleven).

BACKGROUND

Hunter and Payne were indicted on March 7, 2005 for violations of both the substantive and the conspiracy provisions of the Racketeer Influenced and Corrupt Organizations ("RICO") Act; murder and conspiracy to murder in aid of racketeering; distributing and conspiring to distribute cocaine and cocaine base; unlawful possession of firearms, and several other offenses.

Over a four-week trial, the government offered evidence indicating that Hunter and Payne were members of a violent criminal gang which operated from 1983 to 2003. The gang, sometimes known as "the family" or "the East New York mob," was based in Brooklyn's East New York neighborhood and engaged in drug sales, robberies, murders and other criminal activity.

At the close of the trial, both defendants moved for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. I granted some aspects of the motions, finding that the government had not produced sufficient evidence for a reasonable jury to find that the defendants had engaged in money laundering or a money laundering conspiracy, and finding that several charges relating to a robbery conspiracy and firearms violations were barred by the statute of limitations. I denied the rest, except for Payne's argument that charges of murder and conspiracy to murder in aid of racketeering were time-barred because they were not "punishable by death" within the meaning of 18 U.S.C. § 3281, which I declined to decide without briefing. *See* Fed. R. Crim. P. 29(b) (permitting district court to decline to decide Rule 29 motion until after jury returns verdict).

3

The jury found both Hunter and Payne guilty of racketeering and conspiring to commit the offense of racketeering; conspiring to murder and murdering Eric Clemons in aid of racketeering; conspiring to distribute crack and powder cocaine; and using a firearm in connection with drug trafficking. The jury also found Payne guilty of conspiring to murder and murdering Pedro Newton in aid of racketeering; distributing crack and powder cocaine; and conspiring to distribute heroin.

Hunter argues that the racketeering and racketeering conspiracy counts are time-barred by the five-year statute of limitations, noting that he was incarcerated five years before the indictment was brought and arguing that he did not commit any predicate acts after his release from custody. He also argues that he was entitled to a jury instruction on withdrawal from the racketeering conspiracy and drug trafficking conspiracy, and that the government produced insufficient evidence for a reasonable jury to find that he murdered or conspired to murder Clemons in aid of racketeering as opposed to for personal reasons, and that he possessed a firearm within the limitations period. In several *pro se* submissions, Hunter also claims that the prosecutors refused to disclose exculpatory evidence; claims that the evidence was insufficient to allow a reasonable jury to find that one conspiracy or enterprise existed as opposed to multiple conspiracies; and generally argues that the government's evidence was not credible.

Payne contends that all of the charges of murder in aid of racketeering and conspiracy to murder in aid of racketeering are time-barred by the general five-year statute of limitations.[1] I declined to rule on this argument when he first raised it prior to the jury's deliberations. He also moves for a judgment of acquittal on grounds that the evidence was

---

[1] Hunter joined in this application. Tr. 2786.

insufficient to warrant a reasonable jury finding that a single conspiracy or enterprise existed, that the drug conspiracies took place within the applicable limitations period, and that Payne possessed a firearm in relation to the drug offenses or within the limitations period.

DISCUSSION

A.      *Hunter and Payne's Rule 29 Motions*

        1.      *Legal Standard*

        Federal Rule of Criminal Procedure 29 provides that after a jury verdict, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction," Fed. R. Crim. P. 29(a); *see also* Fed. R. Crim. P. 29(c)(1) (allowing for such motions after jury verdicts). "A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'" *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (quoting *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994)). I may overturn a conviction on that basis "only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor," I find that "'no rational trier of fact' could have concluded that the Government met its burden of proof." *Glenn*, 312 F.3d at 63 (quoting *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998)). "'[T]he relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Glenn*, 312 F.3d at 63 (omission in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). My analysis considers "'the evidence in its totality,' and the Government 'need not negate every theory of innocence.'" *Glenn*, 312 F.3d at 63 (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).

In order to "'avoid usurping the role of the jury,'" *Autuori*, 212 F.3d at 114 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)), I must "'defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony'" when reviewing the sufficiency of the evidence. *Glenn*, 312 F.3d at 64 (quoting *United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000)); *see also, e.g.*, *Autuori*, 212 F.3d at 114 ("We may not substitute our own determinations of credibility or relative weight of the evidence for [those] of the jury."). The relevant inquiry is "'whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *Autuori*, 212 F.3d at 114 (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).

Where a fact to be proved is also an element of the offense, however, "it is not enough that the inferences in the government's favor are permissible." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). I "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (citing *United States v. Soto*, 47 F.3d 546, 549 (2d Cir. 1995), and *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)). "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *Glenn*, 312 F.3d at 70 (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

2.       *Violent Crimes in Aid of Racketeering*

i.       *Statute of Limitations*

The indictment in this case was brought on March 7, 2005.  The general criminal statute of limitations, 18 U.S.C. § 3282, prescribes a five-year limitations period.  Accordingly, neither Hunter nor Payne can be convicted of any crime governed by § 3282 unless that crime was committed on or after March 8, 2000.  As all parties agree, the charges of conspiracy to murder in violation of 18 U.S.C. § 1959(a)(5) are governed by the five-year statute of limitations imposed by 18 U.S.C. § 3282, and all involved conduct terminating before March 8, 2000.  They are thus time-barred, and the defendants are entitled to judgments of acquittal on those counts.

Hunter and Payne argue that the charges of murder in aid of racketeering in violation of § 1959(a)(1) are also governed by § 3282's five-year statute of limitations and thus also barred.  The government argues that murder in aid of racketeering is a crime "punishable by death" and thus governed by 18 U.S.C. § 3281, which imposes no statute of limitations on such crimes.[2]

Section 3281 provides that "[a]n indictment for any offense punishable by death may be found at any time without limitation."  Section 1959(a)(1) provides that anyone committing murder in aid of racketeering shall be punished "by death or life imprisonment, or by a fine under this title, or both."  Hunter and Payne argue, somewhat counterintuitively, that this does not render murder in aid of racketeering an "offense punishable by death" within the

---

[2]       Payne moves for a judgment of acquittal on this ground, even though if his argument were successful it would at most justify a new trial where aggravating factors could be submitted and charged to a jury.  I find it most convenient, however, to group this question together with the challenge to the sufficiency of the evidence regarding the murder conspiracies, which also dealt with statutes of limitations on related charges.

meaning of §3281. Rather, they contend that the only offenses "punishable by death" are those in which a jury has found at least one statutory aggravating factor which would, if not outweighed by mitigating factors, allow actual imposition of the death penalty. *See* 18 U.S.C. §3592(b)-(d), 3593(e) (listing aggravating factors, requiring finding of at least one aggravating factor prior to imposition of death penalty).

Hunter and Payne do not attempt to justify their conclusion as a matter of statutory interpretation. 18 U.S.C. §3281 releases limitations on the bringing of indictments based on the content of those indictments, and thus does not appear to contemplate any jury findings whatsoever. Since §3281 applies to an indictment "for any offense punishable by death," one would expect whether or not the offense is punishable by death to be determined by reference to the contents of the indictment. If death is among the penalties authorized for an offense charged in the indictment, then one would think the indictment is "for" an "offense punishable by death" and "may be found at any time without limitation." *Id.* Whatever procedural hurdles or constitutional objections may be raised toward the *actual imposition* of the death penalty at a later time would not seem to affect whether, at the time of indictment, the offense charged is "punishable by death."[3] If the legislature had wished to render a prosecution untimely based on facts that would be determined by a jury, it could easily have barred later *conviction* for an offense if the indictment is brought more than five years after the offense and

---

[3]     There is some other textual support for this view as well. Section 1959(a)'s language prescribing that that those who commit violent crimes in aid of racketeering "shall be punished (1) for murder, by death or imprisonment, or by a fine under this title, or both," closely tracks that of § 3281's phrase "punishable by death." And the procedures governing actual imposition of the death penalty do not use the word "punishable," but rather discuss a procedure to determine when death shall be imposed, based on whether a death sentence is "justified." *See* 18 U.S.C. § 3591 (providing that a defendant who committed certain crimes "shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified").

the jury did not make specified findings, but it appeared to envision resolving the timeliness of a prosecution only at the stage of indictment.

The defendants make two arguments in support of their construction of §3281. The first is based on *United States v. Parrino*, where the United States Court of Appeals for the Second Circuit considered a prosecution for kidnapping under a statute authorizing the imposition of the death penalty if the victim was not released unharmed. 180 F.2d 613, 614-15 (2d Cir. 1950). The Second Circuit found that the indictment, which did not specify that the victim was not released unharmed, was sufficient because the provision related to release was merely a sentencing factor and not an element of the offense,[4] but that the prosecution would be time-barred if the jury did not find that the victim was not released unharmed. *Id.* at 615. The Second Circuit's reasoning was that an offense only becomes "punishable by death" within the meaning of §3281 when the decisionmaker becomes free to exercise its discretion to impose a penalty. *Id.* ("When a crime is made 'punishable' by a prescribed penalty -- fine, forfeiture, imprisonment, death, or anything else -- the choice of the kind and character of the sentence is confided to some authority in its discretion; and it does not become 'punishable' by that authority until all the conditions imposed upon the exercise of its discretion have been satisfied."). As the statute defining the offense forbade a decisionmaker from imposing the death penalty in the absence of a finding that the victim was not released unharmed, the offense was not punishable by death in the absence of such a finding. *Id.* ("[Kidnapping] is punishable by

---

[4] The distinction between sentencing factors and elements of offenses was later essentially jettisoned in *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000). The Second Circuit also opined that even if the requirement that a victim not be released unharmed were an element of the offense, its omission from the indictment would be a harmless variance that would not prohibit the imposition of the death penalty. *Parrino*, 180 F.2d at 615.

either penalty, as soon as the prescribed authority becomes free to exercise its discretion; and the jury becomes free to do so only if the condition is satisfied that the victim has not been released 'unharmed.'").  Put in other words, the *Parrino* court held that whether an offense is punishable by death is determined not with reference to whether death is among the punishments authorized for the offense at the time of the indictment, but by focusing on whether death is actually available for a specific defendant at the end of the trial.

The reasoning used in *Parrino* is inconsistent with the government's position in this case.  The *Parrino* court interpreted the word "punishable" as applying only when all conditions on the discretion of the decisionmaker to actually impose a death sentence have been satisfied.  The finding of at least one aggravating factor is a condition on the decisionmaker's discretion, §3593(d), (e) (conditioning jury's ability to recommend death on a finding of at least one aggravating factor set forth in §3592), and thus if *Parrino* governed, Hunter and Payne's murder in aid of racketeering charges would be time-barred in the absence of a jury finding of at least one aggravating factor.

It is worth noting the perverse consequences *Parrino*'s rule would have if applied to §3593.  While the jury cannot recommend a death sentence without finding at least one statutory aggravating factor, it also cannot recommend a death sentence if the government does not seek the death penalty.  18 U.S.C. §3593(b) (conditioning holding of death penalty hearing on the government attorney's filing of a notice of intent to seek the death penalty).  Under *Parrino*'s logic, a crime cannot be "punishable by death" unless the government actually seeks the death penalty from a qualified jury, because without satisfying those requisites, the decisionmaker does

not have the discretion to impose the death penalty.   Striving mightily to avoid the bizarre consequences of a rule where the government could not bring a prosecution for murder after 5 years unless it was prepared to actually seek to kill the perpetrator,[5] Payne asserts that the government would not be required to seek the death penalty, and no other procedural requirements for the imposition of the death penalty would be needed.  All that would be required, according to Payne, would be a jury's finding of a single aggravating factor.  This reassurance founders on the logic of *Parrino*.  A jury which found a single aggravating factor in a case where the government did not recommend the death penalty, as Payne proposes, simply would not have the discretion to impose a sentence of death.  *See* § 3593(b) (requiring notice of intent to seek the death penalty before holding death penalty hearing); § 3591(a) (conditioning sentence of death on death penalty hearing).  By *Parrino*'s logic, the offense would not be "punishable by death" within the meaning of § 3281, and the crime would be subject to the five-year statute of limitations.

If the foregoing sounds far afield of actual practice, this is because the Second Circuit has since rejected *Parrino*'s approach.  In *United States v. Kostadinov*, 721 F.2d 411, 412 (2d Cir. 1983) (*per curiam*), it interpreted the phrase "punishable by death" in the then-existing federal bail statute in a manner impossible to reconcile with *Parrino*.  The federal bail statute at the time allowed courts additional grounds to deny bail to defendants charged with offenses

---

[5]        The government, it should be noted, would not be allowed to circumvent this result through halfhearted advocacy.  It might be tempting to submit a single aggravating factor and a host of mitigating factors to a death-qualified jury in the hopes that they will find the aggravating factor exists but is outweighed by mitigating factors, but this workaround would be foreclosed by § 3593(a)'s requirement that the government only seek the death penalty if the attorney for the government "believes that the circumstances of the offense are such that a sentence of death is justified."

"punishable by death," and Kostadinov, charged with espionage crimes for which death was authorized under a statute considered likely to be unconstitutional, appealed the denial of bail in his case. 721 F.2d at 412. The Second Circuit found that the government's decision not to seek the death penalty (due to doubts about its constitutionality) did not affect the status of the crime as "punishable by death."[6] This approach is of course contrary to *Parrino*'s reasoning, because the government's failure to seek the death penalty in *Kostadinov* prevented the jury from imposing a death sentence and thus the decisionmaker did not have the discretion to impose the death penalty. As the court in *Kostadinov* construed statutory language identical to the language at issue in *Parrino*,[7] the result in *Kostadinov* appears to abrogate *Parrino*'s reading of the meaning of an "offense punishable by death."

It is true that *Kostadinov*'s holding might not apply to all uses of the phrase "punishable by death," but it does apply to the phrase as it appears in §3281. The court in *Kostadinov* asked whether the term "punishable by death" was intended to refer to the class of offense or the severity of the punishment. That is, *Kostadinov* asked whether the special provisions for offenses punishable by death used the availability of death as a proxy for the seriousness of the offense or whether they instead served a function relevant only to the actual infliction of the death penalty. 721 F.2d at 412 (citing *United States v. Watson*, 496 F.2d 1125, 1128 (4th Cir. 1973)).[8] *Kostadinov* determined that the bail statute referred to the class of

---

    [6]     The term the court used more often in its opinion was "capital," but it defined this term as synonymous with "punishable by death." *Kostadinov*, 721 F.2d at 412. In any event, the actual statutory term in the bail statute was an "offense punishable by death," 18 U.S.C. § 3148 (1968), while only the title of the provision referred to "capital" cases. Similarly, 18 U.S.C. § 3281, at issue here and in *Parrino*, at all relevant times referred to any "offense punishable by death" in the main text, and "capital" offenses in the provision's title.
    [7]     *See supra* note 6 (describing statutory language).
    [8]     To illustrate the distinction, some circuits have found that the purpose of 18 U.S.C. § 3005,

offense, not merely the severity of possible punishment.  Similarly, § 3281 uses "punishable by death" to refer to the nature of the offense, not the type of punishment actually imposed.  *See United States v. Provenzano*, 423 F. Supp. 662, 666 (S.D.N.Y. 1976) (concluding that while the statute authorizing the death penalty was unconstitutional, the offense was "punishable by death" for statute of limitations purposes because § 3281 used "punishable by death" in order to refer to the nature of the offense, not to respond to the penalty imposed), *aff'd*, 556 F.2d 562 (2d Cir. 1977).

The defendant seeks to distinguish *Kostadinov* from *Parrino* by arguing that as a practical matter one cannot make a bail determination after waiting for a jury to fulfill all the procedural requisites governing the imposition of the death penalty.  This is true, but not relevant.  In neither case did the court undertake a wide-ranging policy analysis untethered to the statutory language.  But in any event the policy outcomes of *Parrino*'s approach to statutes of limitations (taken to its inevitable conclusion that the government must actually seek death in order to bring a prosecution after 5 years) are at least as perverse as those that would follow from adopting *Parrino* with respect to the bail statute (which would simply render the special capital bail provision a dead letter).

---

permitting anyone indicted for a capital crime to have two court-appointed attorneys, was based on the severity of punishment -- that is, the need to prevent anyone from actually being executed without having enjoyed the procedural protections afforded by a second attorney.  *E.g.*, *United States v. Dufur*, 648 F.2d 512, 515 (9th Cir. 1980).  Such circuits have therefore interpreted the impossibility of actually executing the prisoner to render the case not capital for § 3005 purposes.  *Dufur*, 648 F.2d at 515 ("Since the statute's purpose, in our opinion, derives from the severity of the punishment rather than the nature of the offense, the elimination of the death penalty eliminates Dufur's right under 18 U.S.C. § 3005 to a second court-appointed attorney.").  The Fourth Circuit, however, has found § 3005 to be based on the nature of the offense as well -- that is, the difficult and complicated nature of murder cases.  *See Watson*, 496 F.2d at 1128.  Those courts have found that § 3005 continues to apply even where there is no possibility of the death penalty's actual imposition.  *Id.* at 1129; *see also United States v. Boone*, 245 F.3d 352, 359 (4th Cir. 2001) (holding *Watson* survives amendment to § 3005).

Perhaps one might argue that applying *Parrino*'s reasoning to *Kostadinov* produces a result, if not worse in policy terms, more at odds with the statutory scheme. On this view, it would be strange for a bail provision to be, by its terms, unable to be satisfied because it requires a finding that cannot be made until the end of trial. This is no more strange than *Parrino*'s reading of §3281. Section 3281, it must be remembered, speaks only of the propriety of an indictment based on the content of that indictment. *See* §3281 ("An indictment for any offense punishable by death may be found at any time without limitation."). *Parrino*'s reasoning embraces the proposition that the contents of an indictment (the character of the offense the indictment is "for") may change after the indictment is found and brought, rendering the finding of the indictment retroactively untimely. If the finding of an indictment can persist in an indeterminate timely or untimely state until the jury becomes prepared to decide whether or not to impose a death sentence, then why cannot a bail determination be indeterminately proper or improper in a similar manner? Such profound puzzles no doubt contributed to the *Kostadinov* court's abandonment of *Parrino*'s methodology. There is no basis for concluding that *Parrino* survives *Kostadinov*'s reevaluation of the meaning of an "offense punishable by death."

Payne's other argument is that *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), and its progeny require me to find this prosecution time-barred. The argument, seen in its strongest light, seems to be that *Apprendi* and *Ring v. Arizona*, 536 U.S. 584, 589 (2002) require statutory aggravating factors to be charged in an indictment. *See Apprendi*, 530 U.S. at 476 ("'[A]ny fact (other than a prior conviction) that increases the maximum penalty for a crime must be *charged in the indictment*, submitted to a jury, and proven beyond a reasonable doubt.'"

(quoting *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (emphasis added)); *see also Ring*, 536 U.S. at 589 (applying *Apprendi* to aggravating factors relevant to death sentence). The argument concludes that the indictment here was not "for" an "offense punishable by death" within the meaning of §3281 because by not including an aggravated factor, it foreclosed the possibility of the imposition of a death sentence even at the time of indictment.

The defendants' constitutional claim is accurate, but it only applies here if one already accepts *Parrino*'s now-repudiated conclusion that an offense is only "punishable" by death when no limits remain on the decisionmaker's discretion to impose a death sentence. While the requirement that aggravating factors must be charged in an indictment in order to authorize the death penalty does eliminate the strangeness of *Parrino*'s retroactive analysis described above, *Kostadinov* repudiated not merely this retroactivity but also the notion that an offense is only "punishable" by death if the death sentence can actually be imposed on that particular defendant. In *Kostadinov*, the possibility of actual imposition of the death sentence was also foreclosed at the time of the bail determination by the government's decision not to seek the death penalty in light of the presumed unconstitutionality of the death penalty statute, 721 F.2d at 412, but this did not strip the offense of its capital character. In *Kostadinov*, as here, the statute's reference to offenses "punishable by death" was intended as a proxy to capture the seriousness of the class of offense, not to provide for special procedures in cases where death might actually be imposed. Therefore, *Kostadinov* teaches that an offense is "punishable by death" if death is an authorized penalty for the offense, even if at the relevant time (here the time of indictment) there is no possibility of the death sentence actually being imposed.

15

This interpretation of § 3281 raises no constitutional issues. The Sixth Amendment rights at issue in *Ring* and *Apprendi* are not implicated here, as the jury trial right is not impinged by the contents of an indictment. This reading also raises no concerns under the Fifth Amendment right to an indictment. To the extent that the right to an indictment includes a right to have the indictment allege a basis for finding the prosecution not time-barred, the indictment here does just that. It alleges that the defendants violated § 1959(a)(1), and this offense is "punishable by death" within the meaning of § 3281, establishing that no statute of imitations bars the prosecution.

Accordingly, I reject the defendants' contentions that their charges on murder in aid of racketeering were time-barred.

ii.     *The Racketeering Motive in the Clemons Murder*

Hunter and Payne were convicted of violating 18 U.S.C. § 1959(a)(1) by murdering Clemons. 18 U.S.C. § 1959(a)(1) criminalizes murder only when the offense was committed, inter alia, "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." Hunter argues that there was insufficient evidence to permit a reasonable jury to conclude that Clemons was murdered to maintain or increase Hunter's position in the enterprise as opposed to merely in retaliation for Clemons's affair with enterprise leader Charles Thomas's girlfriend.[9]

In order to show that a violent crime was committed in aid of racketeering, the government need not prove that the motive to maintain or increase position in an enterprise "was

---

[9]     Payne does not explicitly make this argument, but as stated below I find that the evidence was sufficient to prove a racketeering motive behind his involvement in Clemons's murder as well.

the defendant's sole or principal motive." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). Rather, the connection to racketeering can be established if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.* This inference is permissible in a case where "the defendant, as a leader within the enterprise, was expected to act based on the threat posed to the enterprise and that failure to do so would have undermined his position within the enterprise." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (citing cases).

In this case, the government presented sufficient evidence to enable a reasonable jury to conclude that Hunter and Payne murdered Clemons in order to maintain or increase their positions in the enterprise. While the jury heard that Thomas suspected Clemons of stealing from the enterprise, there is no indication that Hunter or Payne were made aware of that suspicion. Tr. 1328-29.[10] I also reject the government's argument that Clemons's disrespect for Thomas (by sleeping with his girlfriend) damaged the reputation of the enterprise, thus leading Hunter and Payne to defend the enterprise against the "threat" posed by this affair. *See United States v. Jones*, 291 F. Supp. 2d 78, 89 & n.8 (D. Conn. 2003) (rejecting the view that disrespect

---

[10]      The government suggests that the testimony indicating that Thomas shared his suspicions with other enterprise members John Hatcher, Tr. 705, and Henry Harley, Tr. 1972, coupled with the testimony indicating that Thomas shared his *other* suspicions about Clemons with Hunter, Tr. 1328, 1339, permits a reasonable jury to infer that Thomas shared his suspicions about Clemons's theft with Hunter. Respecting the freedom of the jury to make credibility assessments, I agree that this testimony allows a reasonable jury to conclude that the preponderance of the evidence indicates that Thomas shared his suspicions about Clemons's theft with Hunter. But it does not follow, and I decline to find, that a reasonable jury could find that because Thomas told other people his suspicions about Clemons's theft, and Thomas told Hunter his suspicions about other misdeeds by Clemons, therefore it is proven *beyond a reasonable doubt* that Thomas told Hunter his suspicions about Clemons's theft. *See Glenn*, 312 F.3d at 70 ("[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." (internal quotation marks omitted)).

not related to crime can be a sufficient threat to an enterprise to sustain a racketeering motive).

However, the jury heard evidence that Clemons was suspected of having cooperated with the police in a prior criminal case, Tr. 1325, 1328, 1339; that Hunter and Payne both disliked Clemons for this reason, Tr. 1325, 1328; and that Hunter and Payne explicitly referred to this suspected cooperation in their attempt to convince Thomas that Clemons should be killed. Tr. 1339. Crediting this evidence, especially in light of the fact that Hunter and Payne were more aggressive in defending the slight to Thomas's reputation than Thomas himself was, a reasonable jury could find, beyond a reasonable doubt, that Hunter and Payne used Clemons's affair as a pretext to secure Thomas's agreement to the killing, while their true reason for the killing was their longstanding suspicion that Clemons had cooperated with the police. The fact that the killing happened shortly after the affair was discovered does not negate this inference -- a reasonable jury could conclude that Hunter and Payne did not wish to take action against Clemons without Thomas's agreement, and they seized the affair as their opportunity. Eliminating a suspected informant can constitute a killing intended to maintain a defendant's position in an enterprise against the obvious threat posed by one willing to cooperate with the police. Therefore, there was sufficient evidence to support the convictions on this count.

3.    *The Statute of Limitations and the Racketeering and Racketeering Conspiracy Charges*

Hunter argues that he cannot be convicted of the offense of racketeering or racketeering conspiracy because none of the acts supporting those convictions occurred within the five-year limitations period. One of RICO's substantive provisions makes it a crime to "conduct or participate, directly or indirectly, in the conduct of" the affairs of an enterprise

affecting interstate commerce "through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

A "pattern of racketeering activity" consists of at least two racketeering predicate acts, *see* 18

U.S.C. § 1961(1) (enumerating predicate acts), if those acts are sufficiently continuous and related

to one another to constitute a "pattern." *See, e.g.*, *United States v. Aulicino*, 44 F.3d 1102, 1110

(2d Cir. 1995) ("[I]n order to establish a pattern of racketeering activity, a party must show that

the racketeering predicate acts are not isolated or sporadic but are related, and 'that the predicates

themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering

activity.'" (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989))). RICO's

racketeering conspiracy provisions also criminalize conspiring to violate § 1962(c). § 1962(d). I

will address the timeliness of the racketeering and the racketeering conspiracy charges in turn.[11]

      i.     *The Substantive Racketeering Charge*

A prosecution for violating § 1962(c) is untimely unless the defendant committed

at least one predicate act within the limitations period, *United States v. Wong*, 40 F.3d 1347,

1367 (2d Cir. 1994), which in this case is five years, 18 U.S.C. § 3282(a).

Of the six predicate acts the jury found Hunter had committed, only one --

conspiracy to distribute crack and powder cocaine -- was arguably within the limitations period.

Hunter argues that he could not possibly have committed this predicate act within the limitations

period, as he was incarcerated five years prior to the indictment and he claims that he did not

engage in drug trafficking after his release.

---

[11]      For the reasons stated in section B.2, infra, I grant Hunter a new trial on the racketeering and racketeering conspiracy charges. However, this does not relieve me of the obligation of deciding whether or not the jury's verdict finding Hunter guilty of racketeering and racketeering conspiracy was supported by sufficient evidence. If I were to find that the verdict was not supported by sufficient evidence as to those counts, the remedy would be a judgment of acquittal, not a new trial.

The statute governing the drug conspiracy the jury found proven does not require proof of an overt act. 21 U.S.C. § 846. For the purposes of statutes of limitations, such conspiracies terminate not when the last overt act is performed but only upon abandonment or accomplishment of their purposes. *See, e.g.*, *United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir. 1980) ("For limitations purposes, the [§ 846] conspiracy may be deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed.").

A conspirator's membership in a conspiracy, similarly, is presumed to continue until he affirmatively withdraws or the conspiracy ends. *See, e.g.*, *United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003) (noting that members of a conspiracy "continue to be conspirators until there has been an affirmative showing that they have withdrawn" (internal quotation marks omitted)). I address the question of whether or not Hunter was entitled to a jury instruction on withdrawal in section B.2, *infra*, but there was sufficient evidence for a jury to conclude that Hunter did not withdraw, and the conspiracy did not end, more than five years before the indictment was returned. *See, e.g.*, Tr. 768-71, 1456, 1464-66 (evidence that Hunter received money derived from enterprise activity after his release from incarceration); Tr. 1455-57, 1463 (evidence that Hunter sought to acquire a gun from enterprise members within the limitations period); *see also United States v. Agueci*, 310 F.2d 817, 839 (2d Cir. 1962) ("[W]hile arrest or incarceration may constitute a withdrawal from a conspiracy, it does not follow that in every instance it must."). Thus, there was sufficient evidence for the jury to conclude that the presumption of continuity was not rebutted and that Hunter thus participated in the predicate

narcotics trafficking conspiracy within the limitations period.

It is a close question, however, whether Hunter's presumed participation in the conspiracy after his incarceration is sufficient to extend the racketeering predicate act into the limitations period. Hunter argues that a predicate act occurs within the limitations period for the purposes of 18 U.S.C. § 1962(d) only if the defendant actually takes actions amounting to a predicate act inside the limitations period, and not if he merely fails to withdraw from a conspiracy he joined outside the limitations period. *United States v. Persico* contains some language supporting this interpretation of § 1962(c). 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)"). However, *United States v. Spero* indicates that a RICO predicate act may extend into the limitations period due solely to the defendant's failure to withdraw from a conspiracy entered earlier. 331 F.3d at 60. Although *Spero* dealt with a prosecution under § 1962(d), which does not require proof of an overt act within the limitations period, *Persico*, 832 F.2d at 713, the court in *Spero* explicitly declined to rely on this feature of § 1962(d) in deciding the opinion. The defendant in *Spero* objected that § 1962(d) should not be read to relieve the government from the need to prove a predicate act within the limitations period -- effectively asking the court to revisit the precedent indicating that proof of a predicate act is unnecessary. *Spero*, 331 F.3d at 60. The court found it unnecessary to reach the issue, finding that Anthony Spero committed a predicate act within the limitations period because the charged loansharking conspiracy was presumed to continue into the limitations period. *Id.* at 60-61. The government

21

was entitled to such a presumption of continuity because the loansharking conspiracy statute, just like the narcotics trafficking conspiracy statute here, did not require proof of an overt act. *Id.* at 60-61. Therefore, here as in *Spero*, there is sufficient evidence to support the jury's finding that Hunter committed a racketeering act -- continued participation in the narcotics trafficking conspiracy -- within the limitations period.

### ii. *The Racketeering Conspiracy Charge*

As § 1962(d), prohibiting conspiracies to commit the offense of racketeering, also does not contain an overt act requirement, it is subject to the same presumption of continuity afforded to drug trafficking conspiracies. *Persico*, 832 F.2d at 713 ("Because the RICO conspiracy statute does not require proof of an overt act, we believe that the crime of RICO conspiracy is not complete until the purposes of the conspiracy either have been accomplished or abandoned."). That is, a prosecution for a racketeering conspiracy offense is timely so long as the defendant did not withdraw, and the conspiracy did not terminate, prior to the start of the limitations period. Just as there was sufficient evidence to sustain a jury finding that Hunter did not withdraw from the drug trafficking conspiracy, there was also sufficient evidence to sustain a jury finding that Hunter did not withdraw from the racketeering conspiracy. Accordingly, Hunter is not entitled to a judgment of acquittal on the racketeering conspiracy charge.

### 4. *The Existence of A Single Enterprise*

Hunter argues, in his *pro se* submissions, that there was insufficient evidence to support a finding that a single enterprise existed spanning the entire charged period. Payne also

makes this claim and provides no evidence, argument, or authority to support it.[12]  I am not persuaded.

The charges of racketeering, racketeering conspiracy, and violent crimes in aid of racketeering all involve an "enterprise," defined with respect to racketeering offenses as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C.§1961(4).[13]  An enterprise is proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates [constituting the enterprise] function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The Second Circuit has consistently held that "proof of various racketeering acts may be relied on to establish the existence of the charged enterprise."  *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991) (citing *United States v. Ferguson*, 758 F.2d 843, 853 (2d Cir. 1985)); *see also Coonan*, 938 F.2d at 1559 ("[T]he existence of an association-in-fact is oftentimes more readily proven by what it *does*, rather than by abstract analysis of its structure."  (emphasis in original) (internal quotation marks omitted)).

The government presented ample evidence indicating that an enterprise existed and functioned as a continuing unit throughout the period charged in the indictment.  Witnesses testified as to the core membership of the enterprise including John Hatcher, Thomas, Hunter and

_____

[12]    At oral argument, Payne's counsel assured me that this minimalist advocacy was the result of a considered decision, though he did not indicate his reasons for proceeding in this fashion.

[13]    The violent crimes in aid of racketeering statute defines "enterprise" identically except that it excludes the word "individual," and also builds the jurisdictional requirement of an effect on interstate commerce into the definition of "enterprise" as opposed to appending this requirement to the substantive offenses involving enterprises.  *See* 18 U.S.C. § 1959(b)(2) ("'[E]nterprise' includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which effect, interstate commerce.").  Neither variation from the § 1961 definition is material here.

others; the later addition of other core members; the enterprise's objective of enriching its membership by selling narcotics and committing violent robberies; and the enterprise's practice of protecting its membership by murdering suspected informants and rivals, by bailing its members out of jail, and by using the same attorneys for criminal defense. The jury's finding that a single enterprise existed and lasted throughout the charged period was supported by sufficient evidence.[14]

5.      *The Heroin Trafficking Conspiracy*

Payne contends that there is insufficient evidence to support the jury's finding that he is guilty of a conspiracy to distribute heroin seized from Newton within the limitations period. A conspiracy charged under a statute that does not require proof of an overt act, such as the narcotics trafficking conspiracy alleged here, is "deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed." *Grammatikos*, 633 F.2d at 1023. While the jury heard ample evidence that members of the enterprise continued selling drugs well into the limitations period, *e.g.*, Tr. 771-75,[15] the charged heroin distribution conspiracy concerned only a specific quantity of heroin, stolen from Pedro Newton when he was murdered on January 27, 2000. Tr. 2795-98. Payne argues that the government has produced insufficient evidence to support the jury's finding that the conspiracy's purpose -- the distribution of this heroin -- was not accomplished until after

---

[14]      Thus, this case is unlike those Hunter cites where the proof at trial does not support the finding of a single conspiracy, leading to a variance from the indictment. *Cf., e.g.*, *United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001) (finding a variance where evidence at trial was insufficient to support a finding of a single conspiracies).

[15]      For this reason, I reject Payne's cursory challenge to the sufficiency of the evidence supporting the jury's verdict finding him guilty of conspiracy to distribute crack and powder cocaine within the limitations period.

March 8, 2000.

The government's evidence indicated that just after Newton was killed, Thomas sold the heroin taken from Newton. Tr. 737, 1412. The government's theory as to how the conspiracy to distribute the heroin took place within the limitations period is that Payne received the proceeds of the heroin sale in installments, with the later installments being paid within the limitations period. There is no direct evidence regarding when the installment payments were made. Hatcher testified that the proceeds for the sale were $45,000 paid in installments, and that after two conversations one week apart, he demanded payment in full, but did not indicate when those conversations were, and did not indicate when he actually received his last payment. Tr. 738-40. Thomas testified that the proceeds were $30,000, that the first payment of $10,000 was made immediately, and that the purchaser told him to return every alternate day for installments. Tr. 1412. This evidence would be sufficient to enable a jury to find that a preponderance of the evidence indicates that the payments lasted the approximately 6 weeks until March 8, 2000, but is not sufficient to support a finding *beyond a reasonable doubt* that the payments lasted that long. The evidence produced at trial here gives "equal or nearly equal circumstantial support" to a theory of guilt (that the installment payments lasted until March 8, 2000) and a theory of innocence (that the last payment was made before that date), and thus "a reasonable jury must necessarily entertain a reasonable doubt." *Glenn*, 312 F.3d at 70 (internal quotation marks omitted). Therefore, there was insufficient evidence to support the jury's finding that Payne conspired to distribute heroin within the limitations period.

6. *Firearm Possession*

Hunter argues that there was insufficient evidence to support the jury's finding that he possessed a firearm within the limitations period. The government produced voluminous evidence that Hunter was routinely armed in connection with his criminal activity during the period before his incarceration, *e.g.*, Tr. 395, 959-61 (Hunter arrested in 1987 with a handgun); Tr. 394, 378-85 (Hunter arrested in 1988 with a handgun); Tr. 1018-28 (Hunter arrested in 1990 in enterprise location with several firearms); Tr. 1062-66 (Hunter arrested in 1992 with several firearms); evidence that Hunter used firearms in enterprise-related violence before his incarceration, *e.g.*, Tr. 592, 1193 (Hunter shot rival drug dealer); Tr. 604-06, 1205-11 (Hunter shot at rival drug dealer); Tr. 318-23 (Hunter shot rival drug dealer); and evidence that he sought a firearm for personal protection after his release (and thus in the limitations period), Tr. 1456-57, 1463, 1470-71, but no evidence that he actually obtained a firearm during the limitations period. *See* Tr. 1471 (noting that Thomas never gave Hunter the firearm he requested). This is far from sufficient to enable a reasonable jury to find beyond a reasonable doubt that Hunter actually possessed a firearm within the limitations period. *Cf. Glenn*, 312 F.3d at 64, 70 (finding insufficient evidence to support the jury's finding that the defendant killed the victim when the jury heard evidence that many people, including the defendant, had a motive to do it; that the defendant was the last person seen with the victim; that the defendant possessed a handgun and departed the general area of the shooting shortly after the shooting; that the defendant reacted casually when informed of the shooting; and that the defendant later lied to the police about his activities around the time of the shooting).

Payne contends, again without producing any argument, authority, or evidence, that the government produced insufficient evidence to support the jury's finding that he possessed a firearm either in connection with narcotics trafficking or within the limitations period. This minimalist objection is far from persuasive. The government submitted ample evidence to support a jury's finding that Payne possessed a firearm in connection with narcotics trafficking and within the limitations period. The jury heard testimony that Payne kept a stash of guns, drugs, and money near a location where he sold crack cocaine, Tr. 743-44, 757-58, 1427-37; that Hatcher purchased a .38 handgun for Payne, who later attempted to have its firing pin repaired, Tr. 759-60; that on January 29, 2003, federal agents raided an apartment used by Payne and seized a .38 handgun which appeared to have had repairs attempted on its firing pin, Tr. 2351-52; and that the agents seized a plate and razor blades covered with crack residue along with the firearm in that raid. This evidence was more than sufficient to enable the jury to find, beyond a reasonable doubt, that Payne possessed a firearm in connection to narcotics trafficking within the limitations period.

7. *Other Challenges*

Hunter, in his *pro se* submissions, argues at length that the government's accomplice witnesses were not credible. Whatever their merit, these arguments were properly directed toward the jury. The accomplice witnesses were certainly not so patently unbelievable to allow me to substitute my assessment of their credibility for that of the jury.

Outdoing his other challenges to the sufficiency of the evidence in opacity, Payne notes that his motion is intended to preserve all possible challenges to the sufficiency of the

government's evidence, including those on unspecified grounds. This has not led me to discover any additional offenses for which the evidence is insufficient to sustain a conviction.

B.      *Hunter and Payne's Rule 33 Motions*

1.      *Legal Standard*

Federal Rule of Criminal Procedure 33(a) provides that: "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Generally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. N.Y. City*, 143 F.3d 100, 102 (2d Cir. 1998)). I have "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). Though I am entitled to "weigh the evidence and in so doing evaluate for [my]self the credibility of the witnesses," *Sanchez*, 969 F.2d at 1413 (internal quotation marks omitted), I "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury," *Ferguson*, 246 F.3d at 133 (quoting *Autuori*, 212 F.3d at 120). While I have "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," I "nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

2.      *Withdrawal from the Conspiracy*

Hunter argues that his incarceration on April 30, 1999 rendered him eligible for

an instruction on withdrawal from the racketeering conspiracy and the drug trafficking

conspiracy.  This is significant because he was in prison five years before the indictment was

brought, and did not commit any other predicate acts after his release.  If a jury found that he

withdrew from the conspiracy upon his incarceration, prosecution on his racketeering conspiracy

and drug trafficking conspiracy charges would be time-barred.  Further, because the drug

trafficking conspiracy was the only predicate act that the jury found extended into the limitations

period, his withdrawal upon incarceration, if found by a jury, would mean that he committed no

predicate acts within the limitations period and thus could not be prosecuted on the substantive

racketeering count either.  *See Wong*, 40 F.3d at 1367 (noting that a substantive RICO

prosecution is untimely unless the defendant has committed at least one act within the limitations

period).  I did not give the jury an instruction on withdrawal.

i.      *Standard of Review*

Hunter did not request an instruction on withdrawal at the close of the evidence.

After both sides' summations, and prior to the government's rebuttal, Hunter asked for an

instruction on withdrawal "from the enterprise."  Tr. 2988.  I declined to rule on the application

until the next day, when I rejected it based on the fact that it was requested after the close of the

evidence and on my view that he was not entitled to such an instruction.  Tr. 3036-37.  Hunter

objected to my denial of the request.  Tr. 3037.  The jury was charged and retired to deliberate.

During its deliberations, it issued a note asking several questions very precisely focused on when

Hunter's liability for group criminality ended.[16]  This prompted Hunter to ask for a charge of withdrawal from the conspiracy, which I considered separate from a request for a charge of withdrawal from the enterprise and denied as procedurally barred and not warranted.  Tr. 3180-83.

Federal Rule of Criminal Procedure 30(a) requires that requests for instructions be made at or before the close of the evidence.  Rule 30(c) requires that objections to the failure to give a requested instruction inform the court of the objection and the grounds before the jury retires to deliberate.  Failure to comply with Rule 30(c) precludes appellate review except for plain error.  Although at the time I considered a request for an instruction on withdrawal from the enterprise to be distinct from a request for instruction on withdrawal from the conspiracy, upon reflection, I find that the requests are sufficiently similar for me to consider the request for a charge on withdrawal from the enterprise to cover a request for a charge on withdrawal from the conspiracy.[17]  However, since the initial request was made after the close of the evidence in

---

[16]    The text of the note was:

Please affirm whether the following statements are true according to the law.  One, a person is guilty of a racketeering charge if he has committed two or more acts in furtherance of racketeering with at least one of these acts completed after the statute of limitations.  Two, the term conspiracy has exactly the same meaning each time it is used throughout the verdict sheet.  Three, a conspiracy ends when its goals are either accomplished or abandoned.  Four, does the termination of the conspiracy or the end of one's participation in said conspiracy constitute the completion of the act under the racketeering?  Would you please repeat your initial instructions on Counts One and Two [RICO substantive and RICO conspiracy]?

Tr. 3177-78.

[17]    Indeed, the only way a charge on withdrawal from an enterprise would make sense would be in instructing the jury on withdrawal from an 18 U.S.C. § 1962(d) conspiracy to violate § 1962(c)'s prohibition on conducting, or participating in the conduct of the affairs of an enterprise through a pattern of racketeering activity.  As discussed in section B.2.iv, *infra*, a defendant's argument that he was not sufficiently involved with the affairs of the enterprise itself, as opposed to the conspiracy to conduct the affairs, calls for instruction only on the elements of

violation of Rule 30, I will analyze my failure to give the instruction as plain error. *See United States v. Watson*, 894 F.2d 1345, 1350 (D.C. Cir. 1990) (analyzing refusal to give belatedly-requested charge under plain error standard); *see also United States v. Hernandez*, 730 F.2d 895, 900 (2d Cir. 1984) (affirming district court's rejection of request for instruction made after close of evidence where rejection was not error); *United States v. Tourine*, 428 F.2d 865, 868 (2d Cir. 1970) (upholding denial of belated requests for jury instruction without specifying whether plain error analysis applies); Fed. R. Civ. P. 30(c) (prescribing plain error review for instructions that were not objected to prior to deliberation).[18]

Plain error requires "'(1) error; (2) that is plain; and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Thomas*, 274 F.3d 655, 667 (2d Cir. 2001) (alterations in original) (internal citations omitted) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)).

ii. *Plain Error*

A conspirator's membership in a conspiracy is presumed to continue until he affirmatively withdraws or the conspiracy ends. *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002). The defendant has the burden of proving withdrawal. *United States v. Berger*,

---

the offense, not on any "withdrawal," due to the fact that the government already has the burden of proving the defendant's continued involvement with the enterprise beyond a reasonable doubt.

[18] The government argues that regardless of what standard the court of appeals will use to review my decision, I should simply consider Rule 33's standard of "whether letting a guilty verdict stand would be a manifest injustice." *Sanchez*, 969 F.2d at 1414. It is true that the standard for granting a motion pursuant to Rule 33 differs from the plain error standard, but as I conclude that I committed plain error in refusing to give this instruction, Rule 33's requisites are necessarily satisfied.

224 F.3d 107, 118 (2d Cir. 2000).  In order for a court to find that a conspirator withdrew, it must find more than "mere cessation of activity" by the defendant; generally, "there must also be affirmative action, either the making of a clean breast to the authorities or communication of abandonment in a manner reasonably calculated to reach co-conspirators." *Berger*, 224 F.3d at 118 (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964)).  Significantly, however, a defendant who is incarcerated during the course of a conspiracy "is entitled to a jury instruction on withdrawal." *United States v. Salameh*, 152 F.3d 88, 150 (2d Cir. 1998) (*per curiam*); *see also United States v. Panebianco*, 543 F.2d 447, 454 n.5 (2d Cir. 1976) ("[W]hether an imprisonment constitutes withdrawal from the conspiracy must be decided *by the jury* in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence." (emphasis added)).  As Hunter was incarcerated during the course of the conspiracy, he was entitled to a jury instruction on withdrawal.  This satisfies the requirements of error that is plainly apparent under controlling law.  *See United States v. Gilmore*, 471 F.3d 64, 66 (2d Cir. 2006) (finding error to be plain because the holding of the controlling case was clear).

        iii.     *Effect on Substantial Rights and on the Fairness, Integrity, or Public Reputation of Judicial Proceedings*

For error to be "plain error," it must have an effect on the defendant's substantial rights and must seriously affect the fairness, integrity, or public reputation of judicial proceedings.  An error has an effect on substantial rights when it is prejudicial and affects the outcome of the court's proceedings; that is, when the defendant can show "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 81-82 (2004).  Whether error

seriously affects the fairness, integrity, or public reputation of judicial proceedings seems to be analyzed on a case-specific basis. *Compare Thomas*, 274 F.3d at 671-73 (finding that an *Apprendi* violation seriously affected the fairness and public reputation of judicial proceedings when the defendant was prepared to contest the drug quantity), *with United States v. Cotton*, 535 U.S. 625, 633-34 (2002) (finding that an *Apprendi* violation as applied to an indictment did not seriously affect the fairness, integrity or public reputation of judicial proceedings when the evidence against the defendant regarding drug quantity was "overwhelming" and "essentially uncontroverted").[19]

      The government argues that the failure to instruct the jury on withdrawal was of little consequence because a jury would have been unlikely, and possibly unable, to find that Hunter withdrew. I disagree. The government argues that Hunter presented no evidence which would have entitled the jury to find that Hunter committed an "affirmative action" sufficient to withdraw from the conspiracy, because mere cessation of criminal activity is not enough. *Borelli*, 336 F.2d at 388. The rule, however, is that "a conspirator who presents evidence of his imprisonment during the course of the conspiracy is entitled to a jury instruction on withdrawal," *Salameh*, 152 F.3d at 150; *accord Flaharty*, 295 F.3d at 193, not that he is entitled to a jury instruction on withdrawal if he presents imprisonment and evidence of some other affirmative action (which, of course, would itself support a withdrawal instruction). It would be very strange

---

[19]     The government cites *United States v. Flaharty* for the proposition that the failure to give an instruction on withdrawal due to incarceration is not a basis for appellate reversal of the conviction unless "the defendant can show that a properly instructed jury would likely have found that he withdrew from the conspiracy." 295 F.3d 182, 193 (2d Cir. 2002) (citing *Salameh*, 152 F.3d at 150). As *Flaharty* cites *Salameh*'s plain error analysis for this proposition, I take "would likely have found" to be a loose paraphrase of the plain error standard, not a new and different standard applicable to unpreserved claims of withdrawal due to incarceration.

for defendants to be entitled to withdrawal instructions as a matter of law even where there is insufficient evidence to allow juries to conclude that they withdrew.

Indeed, while the language in *Borelli* regarding "affirmative action" or an "affirmative act" can be distracting, subsequent cases make clear that getting incarcerated itself can constitute the requisite affirmative act. This somewhat peculiar reading of the phrase "affirmative act" was first posited in *Borelli*, where Judge Friendly assumed without deciding that "the unlikelihood of the other conspirators' relying for further aid on a person known to be confined for the very offense in which they were engaging makes such confinement a sufficient 'affirmative act' to sustain the defense of withdrawal in absence of countervailing evidence," 336 F.2d at 390, and indicated that evidence of incarceration upon retrial (ordered for other reasons) would "raise a question for the jury" on withdrawal, *id.*

The Second Circuit subsequently expanded on this possibility in *Panebianco*, where it noted that while a conspirator's mere assertion of cessation was not sufficient, evidence of a defendant's actual imprisonment "would have been enough to make his withdrawal a jury issue." 543 F.2d at 453. The court in *Panebianco* appended a footnote making clear that it did not contemplate a defendant needing to show evidence of any affirmative acts besides being incarcerated in order to enable a jury to find that he withdrew. *Id.* at 454 n.5 ("Although in some instances a conspirator's incarceration will imply that his membership in the conspiracy is terminated, in other instances the conspirator's participation can continue through his prison term: he may passively retain a stake in the venture with the intention of rejoining it upon his release, or he may even manage to play an active role in the conspiracy from his prison cell.");

34

*see also United States v. Consol. Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961) ("That the arrest of a conspirator removes the presumption of continuing participation by him in the conspiracy is well established.").

Similarly, more recent cases in which a court has found the failure to instruct the jury on withdrawal due to incarceration not to be plain error have involved robust showings of either swift resumption of conspiratorial activities after a brief term of incarceration, *see Flaharty*, 295 F.3d at 193 (finding no plain error when the defendant was incarcerated nearby for several months during a six-to-seven-year conspiracy and when three witnesses indicated that he resumed or elevated his previous conspiratorial activity upon release), or else actual criminal conduct while incarcerated, *see Salameh*, 152 F.3d at 150-51 (finding no plain error where participant in 1993 World Trade Center bombing conspiracy was incarcerated only for six months and the government presented "compelling" evidence that the defendant, while incarcerated, discussed the bombing conspiracy in code and agreed to convey "terrorist materials" to coconspirators).

In all, the fact that Hunter does not present evidence that he committed some other affirmative act while incarcerated is of little weight. There was substantial evidence that after Hunter's release he did not resume his former activities but focused his energies on his legitimate Biker-Soc business. *E.g.*, Tr. 769-71, 1389-90, 2053-56, 2493-2507, 2673-78. The government's evidence that Hunter received money from enterprise members to invest in his legitimate business does not make it substantially less likely that the jury might have concluded that he ceased his participation in the RICO and narcotics conspiracies, even if the enterprise

members' money was criminally derived. Tr. 770-71. The government's evidence that Hunter wished to acquire a firearm, *e.g.*, Tr. 1456-57, might have led members of the jury to conclude that he intended to continue his participation, but might simply have suggested that he felt he needed personal protection. And while the government suggests that Hunter's desire to "lay low," Tr. 1456, so as to avoid allowing the police to figure out the scope of his previous activities with the enterprise indicates that he was still a participant, this evidence is at least as suggestive of the opposite conclusion.

More fundamentally, the jury's own behavior provides good reason to conclude that they might well have found that he had withdrawn. As mentioned above, the jury issued a note that evidenced admirable attention to the statutes of limitations and to the duration of conspiracies. The concerns expressed in the note were entirely consistent with the verdicts the jury rendered with respect to Hunter, finding that the racketeering conspiracy and the narcotics distribution conspiracy (and therefore, the substantive racketeering charge) were proven but that actual narcotics distribution within the statute of limitations was not proven. Taken together with the substantial evidence Hunter put forth regarding his cessation of activities after his incarceration and the thin showing the government made regarding further criminal activity, I conclude that there is a reasonable probability that the jury's verdict would have been different had it been instructed properly on withdrawal.

Therefore, I conclude that the error affected Hunter's substantial rights. For similar reasons, I also conclude that failure to correct the error seriously affected the fairness of the proceedings. Due to my failure to instruct the jury on withdrawal, Hunter was deprived of

the opportunity to raise a potentially meritorious defense to the drug trafficking conspiracy, racketeering conspiracy, and substantive racketeering charges. *Cf. Thomas*, 274 F.3d at 672 (finding that *Apprendi* violation "'seriously affected' the fairness of the proceedings because it deprived [the defendant] of the opportunity to raise a reasonable doubt as to an issue -- drug quantity -- which his arguments before the District Court demonstrate that he was prepared to contest").

Accordingly, I conclude that it was plain error to fail to instruct the jury on withdrawal from the conspiracy. The interests of justice require a new trial for Hunter on counts One, Two, and Ten.

    iv.    *Prejudice to Payne*

Payne argues that he was prejudiced by my failure to instruct the jury on Hunter's withdrawal "from the enterprise," reasoning that the jury would have been likely to find that Hunter's withdrawal from the enterprise caused the enterprise to dissolve entirely. Payne provides no authority indicating that a defendant is entitled to an instruction on withdrawal from an enterprise, and I am not certain what such a charge would mean. Payne cites to *United States v. Morales*, which found an analogy between an appellate court's assessment of whether there is sufficient evidence for a jury to find that an enterprise existed during the charged time period and a jury's assessment of whether or not incarceration constitutes a withdrawal from a conspiracy. 185 F.3d 74, 80-81 (2d Cir. 1999). But this analogy is not sufficiently tight to enable, much less require, me to fashion jury instructions on a defendant's "withdrawal" from an enterprise.

The crucial difference between enterprises and conspiracies in this context, which

Payne fails to take into account, is the legal presumption of continuity afforded conspiracies. Absent an affirmative showing otherwise, a conspiracy with no overt act requirement is presumed to remain in existence, and a defendant is presumed to remain associated with it, until its objectives have either been accomplished or abandoned. *See, e.g.*, *Spero*, 331 F.3d at 60 (holding that for conspiracies without overt act requirements, "where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated, and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn" (internal quotation marks, emphasis, and alterations omitted)). Therefore, a jury must be instructed on what might constitute such an affirmative showing (such as withdrawal through incarceration), so that the defendant can overcome the legal presumption of continuity in an appropriate case. But the existence or continuity of an enterprise -- unlike a conspiracy -- is not legally presumed; an enterprise must be proven beyond a reasonable doubt to continue throughout substantially the entire period charged in the indictment. *See Turkette*, 452 U.S. at 583 ("The existence of an enterprise at all times remains a separate element which must be proved by the Government."). It is hard to see what a withdrawal instruction would add to the charge that the government must prove beyond a reasonable doubt that the enterprise continued, beyond simply suggesting one basis (among many) on which a jury might decline to find the requisite continuity.[20] As the jury

_____

[20]    Although this is not relevant to Payne's case, a defendant who argued that he himself ceased to participate in a continuing enterprise would also not be able to obtain an instruction on withdrawal from the enterprise. With regard to a charged substantive violation of § 1962(c), the government must prove beyond a reasonable doubt that the defendant, during the statutory period, conducted, or participated in the conduct of, the affairs of the enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). There is no legal presumption that any racketeering acts were committed as the defendant's way of conducting, or participating in the conduct of, the affairs of the enterprise, and so there is thus no need for a withdrawal instruction to enable a

was properly charged that it was required to find, beyond a reasonable doubt, that the enterprise

continued for substantially the entire period charged in the indictment, no instruction on

withdrawal from an enterprise would have been proper.[21]

Alternatively, Payne may be suggesting that he was prejudiced by my failure to

charge the jury on Hunter's withdrawal from the conspiracies because a finding that he did

withdraw would have made more likely a finding that the enterprise ceased to exist outside the

limitations period.  I am not persuaded.  First, I presume that the jury understood and followed

my instruction that they must find beyond a reasonable doubt that the enterprise continued

throughout the requisite period in order to convict a defendant on RICO charges.  Indeed, given

the acuity of this particular jury, that conclusion is not merely presumed but quite likely.  This

finding would not have been affected by a finding that Hunter had rebutted the legal presumption

of continuity accorded his conspiracies.  Second, even if the jury's conclusions regarding

Hunter's legal status somehow affected its factual finding as to whether the enterprise continued,

I find it extremely unlikely that the jury would have found that the enterprise ceased to continue

upon Hunter's incarceration.  There was voluminous evidence of continued participation by all

of the other key members and leaders.  *E.g.*, Tr. 770-75, 1474-76, 2351-52; *cf. Morales*, 185 F.3d

at 80-81 (finding insufficient evidence to support continuity of enterprise where *all* of the

---

defendant to argue that his later predicate acts were not committed for that purpose.  With regard to a RICO
conspiracy count, a defendant is entitled to an instruction on whether he withdrew from the conspiracy to conduct,
or participate in the conduct of, the affairs of the enterprise, but that is precisely because the conspiracy to do so
does entail a legal presumption of the defendant's continued association with the conspiracy.  *Spero*, 331 F.3d at 60
("[W]here a conspiracy contemplates a continuity of purpose and a continued performance of acts . . . its members
continue to be conspirators until there has been an affirmative showing that they have withdrawn."  (internal
quotation marks, emphasis, and alterations omitted)).

[21]     As discussed *supra*, I reject Payne's claim that there was insufficient evidence to support this
finding.

members died or were simultaneously incarcerated for a long period of time and there was no evidence of continued activity). Accordingly, I do not find that it is in the interest of justice to grant Payne a new trial on the RICO counts.

3.  *Refusal to Disclose Exculpatory Evidence*

Hunter argues that the government withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), when it withheld the notes generated from proffer sessions with other members of the enterprise. Hunter argues that members of the enterprise proffered with the government and discussed the nature and extent of the enterprise without reference to Hunter, thus undermining the government's position that Hunter participated in the enterprise. I have reviewed relevant materials provided by the government in camera,[22] and conclude that the government did not withhold any material exculpatory evidence.

CONCLUSION

For the reasons stated above, I find that Hunter is entitled to a judgment of acquittal on Counts Three (conspiracy to murder Clemons in aid of racketeering) and Twelve (use of a firearm in relation to Counts Ten and Eleven), and is entitled to a new trial on Counts One (racketeering), Two (racketeering conspiracy), and Ten (conspiracy to distribute crack and powder cocaine), but I sustain his conviction on Count Four (murder of Clemons in aid of racketeering). I find Payne entitled to a judgment of acquittal on Counts Three (conspiracy to murder Clemons in aid of racketeering), Five (conspiracy to murder Newton in aid of racketeering), and Thirteen (conspiracy to distribute heroin), but I sustain his conviction on Counts One (racketeering), Two (racketeering conspiracy), Four (murder of Clemons in aid of

---

[22]  To facilitate appellate review, these will be filed under seal as Court Exhibit One of today's date.

racketeering), Six (murder of Newton in aid of racketeering), Ten (conspiracy to distribute crack and powder cocaine), Eleven (distribution of crack and powder cocaine), and Twelve (use of a firearm in relation to counts Ten and Eleven).

So ordered.


John Gleeson, U.S.D.J.


Dated: January 31, 2008
      Brooklyn, New York